1
2
3
4
5          ***E-FILED - 12/22/08***
6
7
8          IN THE UNITED STATES DISTRICT COURT
9
           FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11
RICHARD B. HALL,                    )    No. C 06-2808 RMW (PR)
12                                   )
              Petitioner,            )    ORDER DENYING
13                                   )    PETITION FOR WRIT
    vs.                              )    OF HABEAS CORPUS
14                                   )
LARRY SCRIBNER, Warden,             )
15                                   )
              Respondent.            )
16 _____  )

17          Petitioner, a state prisoner proceeding pro se, filed a petition for a writ of habeas corpus

18 pursuant to 28 U.S.C. § 2254.  The court ordered respondent to show cause why the petition

19 should not be granted.  Respondent has filed an answer addressing the merits of the petition, and

20 petitioner has filed a traverse.  Having reviewed the briefs and the underlying record, the court

21 concludes that petitioner is not entitled to relief based on the claims presented and denies the

22 petition.

23                              **BACKGROUND**

24          In 1999, petitioner and Ericka Ryan met in Louisville, Kentucky.  (Resp. Ex. I (People v.

25 Hall, California Court of Appeal, First Appellate District, Division Four, Case No. A094198,

26 September 30, 2003) at 1.)  Petitioner and Ryan were living with petitioner's friend, Mickey

27 Parsons.  (Id. at 2.)  Parsons and petitioner discussed moving to Florida because petitioner had

28 warrants out for his arrest relating to child support payments.  (Id.)  Petitioner and Parsons later

had a falling out after Parsons changed his mind about traveling to Florida, and Ryan and petitioner left for California instead.  (Id.)  Petitioner and Ryan traveled by car for several days with money obtained from Ryan's family, from pawning petitioner's golf clubs, and from Ryan "working the truckers" for money and drugs.  (Id.)  Once they arrived in California, they stayed with Ryan's brother, (id.), and both found odd jobs, (id. at 3).

In August, they decided to leave California, took a bus to Oregon, and got off in Orick, Oregon.  (Id.)  They had little to no money leftover, and spent the next two days walking around, eating nothing and sleeping outdoors.  (Id.)  According to petitioner, Ryan talked about stealing a purse or backpack.  (Id. at 3-4.)  They wandered into Lost Man Creek parking area, and encountered the victim, David Schauer, who approached petitioner and Ryan and began talking to them.  (Id. at 4.)  At this point, Ryan's version of events are markedly different from petitioner's version of events.  (Id.)

Ryan testified that petitioner spoke with Schauer briefly before Schauer walked up one of the trails.  (Id.)  When they ran into him again coming down the trail, Ryan and petitioner "communicated through their eyes," leading her to understand that petitioner was going to choke Schauer.[1]  (Id.)  Ryan testified that petitioner ran at Schauer from behind and they both fell down.  (Id.)  Ryan heard a "gurgle" or something and she believed petitioner was choking Schauer and began walking down to the parking area.  (Id.)  After hearing something strange, she turned around and saw Schauer looking at her while petitioner was "stomping on his head," and watched him do that three times before she turned again and walked away.  (Id.)  Petitioner later caught up with her and threw Schauer's video camera and jacket into the woods.  (Id. at 5.)  Petitioner had Schauer's key to his Isuzu, Schauer's driver's license, a bag of marijuana, and $60 in cash.  (Id.)  They got into Schauer's Isuzu and drove out of the area.  (Id.)

Petitioner testified that Schauer had approached them and seemed "stoned."  (Id.)  Schauer invited them up the mountain to smoke marijuana, and while petitioner did not smoke

---

[1]  Petitioner previously had conversations with Ryan and Parsons regarding his ability to "choke 'em out," meaning that he knew how to render a person unconscious by applying a hold which closed off the carotid arteries in the neck.  (Id. at 2.)

1    marijuana, Ryan persuaded him to accompany them. (<u>Id.</u>) Ryan carried two makeshift weapons

2    and she told petitioner that she intended to get a ride or money from Schauer in exchange for a

3    sexual favor or "whatever it took." (<u>Id.</u>) At that point, petitioner decided not to go with them

4    and walked back to wait for Ryan. (<u>Id.</u>) Almost an hour later, Ryan came running down the

5    trail, panicked, and said there had been an accident and Schauer might be hurt. (<u>Id.</u>) Petitioner

6    ran up the trail with Ryan, saw Schauer lying down, checked his pulse and found there was none.

7    (<u>Id.</u>) Petitioner told Ryan to pick up Schauer's things while he covered up Schauer's body with

8    logs. (<u>Id.</u>) They got into Schauer's Isuzu and drove away. (<u>Id.</u>) Ryan admitted to petitioner

9    later that "things got out of control and she had hit the man with rocks." (<u>Id.</u> at 6.)

10    Thereafter, petitioner and Ryan traveled several western states, using Schauer's credit

11    cards for everything until eventually the credit cards were declined. (<u>Id.</u> at 7.) When the Isuzu

12    ran out of gas, they hitched a ride with a trucker into town and traded petitioner's watch for a

13    night at a motel. (<u>Id.</u>) An officer traced the abandoned Isuzu and found petitioner and Ryan at

14    the motel. (<u>Id.</u>)

15    Both petitioner and Ryan were charged with murder with a robbery-murder special

16    circumstance. (<u>Id.</u> at 8.) Ryan eventually pleaded guilty to voluntary manslaughter. Petitioner

17    went to trial and, on January 16, 2001, the jury found him guilty of first degree murder and found

18    true the special circumstance. (<u>Id.</u>) The court sentenced petitioner to life without the possibility

19    of parole. (<u>Id.</u>)

20    On direct appeal, the state appellate court affirmed petitioner's conviction and sentence

21    on September 30, 2003. The state supreme court denied a petition for review on January 14,

22    2004. The state supreme court denied petitioner's habeas petition on January 25, 2006. The

23    instant petition was filed on April 24, 2006.

## DISCUSSION

24

25    **A. Standard of Review**

26    This court may entertain a petition for writ of habeas corpus "in behalf of a person in

27    custody pursuant to the judgment of a state court only on the ground that he is in custody in

28    violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, Williams v. Taylor, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340. The court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision

1   of the highest state court to address the merits of a petitioner's claim in a reasoned decision.

2   <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  The standard of review under the

3   AEDPA is somewhat different where the state court gives no reasoned explanation of its

4   decision on a petitioner's federal claim and there is no reasoned lower court decision on the

5   claim.  When confronted with such a decision, a federal court should conduct "an independent

6   review of the record" to determine whether the state court's decision was an objectively

7   unreasonable application of clearly established federal law.  <u>Richter v. Hickman</u>, 521 F.3d 1222,

8   1229 (9th Cir. 2008).

9   **B.**   **Petitioner's Claims**

10       **1.**   <u>Ineffective assistance of trial counsel</u>

11       Petitioner claims that counsel provided ineffective assistance because he failed to have

12   DNA and fingerprint analysis conducted on items recovered from the crime scene to establish

13   that (1) Ryan had physical contact with items used to kill Schauer and the concealing of

14   Schauer's body, and (2) that Ryan had physical contact with Schauer.  (Petition at 1-3.)

15   Petitioner opines that had counsel conducted this testing for Ryan's DNA or fingerprints on

16   some unspecified item(s) recovered from the crime scene, and had the testing discovered

17   evidence of Ryan's DNA or fingerprints, the jury would have understood that Ryan's testimony,

18   placing her far away from the crime scene, was false, and would have credited petitioner's

19   testimony instead.  (Petition at 1-3.)

20       A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

21   Amendment right to counsel, which guarantees not only assistance, but effective assistance of

22   counsel.  <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).  The benchmark for judging any

23   claim of ineffectiveness must be whether counsel's conduct so undermined the proper

24   functioning of the adversarial process that the trial cannot be relied upon as having produced a

25   just result.  <u>Id.</u>

26       In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner

27   must establish two things.  First, he must establish that counsel's performance was deficient, i.e.,

28   that it fell below an "objective standard of reasonableness" under prevailing professional norms.

1    Id. at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient

2    performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional

3    errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable

4    probability is a probability sufficient to undermine confidence in the outcome.  Id.

5            Assuming without deciding that counsel was deficient,[2] petitioner fails to demonstrate

6    prejudice from his claim.  See id. at 697 ("If it is easier to dispose of an ineffectiveness claim on

7    the ground of lack of sufficient prejudice, . . . that course should be followed.").  At trial, the

8    state presented DNA evidence demonstrating that blood at the scene of the crime originated from

9    Schauer, and not from petitioner or Ryan.  (Resp. Ex. H-1.)  Further, the state presented DNA

10   test results eliminating Ryan as the source of any non-sperm evidence that was gathered from

11   Schauer's penile swab and underpants.  (Resp. Ex. H-2.)

12           Petitioner proffers no evidence that Ryan's DNA or fingerprints would have been

13   discovered had counsel conducted any additional tests.  Furthermore, petitioner does not specify

14   which items from the crime scene he believed counsel should have tested for Ryan's DNA or

15   fingerprints, apart from the blood and the victim's clothing that were already tested by the

16   prosecutor.   In short, petitioner merely alleges that *if* counsel had conducted tests on unspecified

17   items from the crime scene, and *if* they had shown Ryan's fingerprints or DNA, the results would

18   have undermined Ryan's testimony and the outcome of trial would have been different.  Such

19   speculation is insufficient to establish prejudice.  See Gonzalez v. Knowles, 515 F.3d 1006,

20   1015-16 (9th Cir. 2008) (concluding insufficient showing of prejudice based on speculative

21   claim that counsel was ineffective for failing to investigate potential mitigating factors based on

22   mental health when petitioner failed to allege any mental health defect).

23           Even if any additional tests would have resulted in the finding of Ryan's DNA or

24   _____

25           [2]  While petitioner's direct appeal was pending, he filed a post-conviction motion to
     appoint counsel for the purpose of requesting DNA testing under California Penal Code § 1405.
26   (Resp. Ex. H-3.)  The trial court appointed trial counsel to investigate whether such a motion was
     warranted and if it were, to file one.  (Resp. Ex. H-4.)  Petitioner objected to the appointment of
27   trial counsel, and now claims that counsel's subsequent filing of a motion for DNA testing is a
     concession by counsel that he performed deficiently at trial by not requesting such testing
28   previously.  (Petition at 1-3.)

1    fingerprints, petitioner fails to demonstrate a "reasonable probability that, but for counsel's

2    unprofessional errors, the result of the proceeding would have been different." Strickland, 466 at

3    694.  The post-mortem evidence showed that it was physically unlikely that Ryan inflicted the

4    mortal wounds.  While Ryan was 5 feet tall, 130 pounds, Schauer was 6-feet, 150 pounds, and

5    suffered a choking injury to his neck, consistent with the perpetrator having used considerable

6    force to result in unconsciousness.  (RT 492, 498-500, 517.)  Petitioner alleges that any finding

7    of Ryan's DNA or fingerprints on items recovered from the crime scene would necessarily cause

8    the jury to believe his version of events and not Ryan's.  However, any such finding would not

9    necessarily even serve to impeach Ryan's testimony as her DNA or fingerprints might have

10   shown up on Schauer's clothing when she and petitioner first encountered Schauer on the trail.

11       In light of the above, and after a thorough and independent review of the underlying

12   record, this court concludes that petitioner has not shown that he was prejudiced by counsel's

13   alleged failure to conduct additional scientific tests on items recovered from the crime scene.

14   Petitioner fails to establish a reasonable likelihood that but for counsel's failure to conduct

15   testing, the results of the proceeding would have been different.  The state court's denial of this

16   claim was not contrary to or an unreasonable application of clearly established federal law.  See

17   Richter v. Hickman, 521 F.3d 1222, 1229 (9th Cir. 2008).

18       2.   Impartial jury

19       Petitioner claims that he was denied his constitutional right to an impartial jury because

20   the trial court failed to adequately investigate a juror's assertion that his wife received a phone

21   call from the jail in which petitioner was housed, failed to determine what that juror said to other

22   jurors regarding the call, and failed to admonish the juror not to discuss the matter with other

23   jurors.  (Petition at 2-2 - 2-4.)

24       During trial, and out of the presence of the jury, juror 102820 informed the court that his

25   wife received a collect call from an unidentified inmate at the county jail where petitioner was

26   currently housed.  (RT 730, 734-36.)  She did not accept the charges and hung up without

27   speaking with anyone.  (RT 735-36.)  The court asked juror 102820 if there was anything about

28   that call that would affect his ability to be fair or impartial, to which the juror responded in the

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.Rmw\HC.06\Hall808den.wpd                    7

1    negative.  (RT 736.)  The juror further stated that he could decide the case solely on the evidence

2    presented in the courtroom.  (RT 736.)  Two days later, the parties stipulated to the excusal of

3    juror 102820 because he became ill and needed emergency surgery.  (RT 1566.)

4         During jury deliberation, upon request of defense counsel, the court asked juror 102820,

5    who was still recovering in the hospital from his surgery, whether he had ever spoken to other

6    jurors about the phone call received by his wife.  (RT 2200.)  The court informed the parties

7    what it proposed to tell the jury and both parties agreed with the proposed statements.  (RT 2200-

8    02.)  The court called the jury in from deliberations where the following occurred:

9              THE COURT: Good morning.  We are in session in People versus
              Richard Hall.  Mr. Hall, both counsel, and the twelve jurors are present.
10             We figured you wouldn't want to come in here and leave all of the
              goodies that are in your room in there.  I'll try to keep the bailiffs away
11             while you're in here.  We did have one brief issue I wanted to discuss
              with you, and then we'll let you go back to your deliberations.  During
12             the trial, one of the jurors, it was (102820), who was the gentlemen [sic]
              that became ill, indicated that he had received a telephone call during the
13             trial that was allegedly from the jail.  And apparently he may have
              mentioned that to one or more of you.  I can indicate by the way that
14             (102820) is doing very well.  So I thought you might like to know that.
              What I wanted to tell you was that it was determined that that telephone
15             call was not from the jail.  It had nothing to do with this case.  It had
              nothing to do with anyone associated with this case.  And I wanted to
16             then ask, is there anyone on the jury panel who thinks that what they
              heard from (102820) about this phone call that was determined not to
17             have anything to do with this case would in any way affect your ability
              to be fair and impartial?  And if so, would ask you to raise your hand.
18             Seeing no hands then, and I'll ask for a show again, does everybody
              agree that whatever it was about this – and most of you probably never
19             even heard of it – that that would in no way affect your ability to be fair
              and impartial?  Everybody agree with that?  Everyone's raising their
20             hand.  Either counsel have anything more on this issue?

21   (RT 2201-02.)

22        The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of

23   impartial jurors.  U.S. Const. amend. VI; see Irvin v. Dowd, 366 U.S. 717, 722 (1961).  "Even if

24   only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to

25   an impartial jury."  Tinsley v. Borg, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotations

26   omitted).  However, the Constitution "does not require a new trial every time a juror has been

27   placed in a potentially compromising situation."  Smith v. Phillips, 455 U.S. 209, 217 (1982).

28        "Clearly established federal law, as determined by the Supreme Court, does not require

1  state or federal courts to hold a hearing every time a claim of juror bias is raised by the parties."

2  Tracey v. Palmateer, 341 F.3d 1037, 1045 (9th Cir. 2003).  Relying on Remmer v. United States,

3  347 U.S. 227 (1954) and Smith v. Phillips, 455 U.S. 209 (1982), the Ninth Circuit has held that

4  "[a] court confronted with a colorable claim of juror bias must undertake an investigation of the

5  relevant facts and circumstances."  Dyer v. Calderon, 151 F.3d 970, 974 (9th Cir. 1998) (en

6  banc).  All that due process requires is that "all parties be represented, and that the investigation

7  be reasonably calculated to resolve the doubts raised about the juror's impartiality."  Id. at 974-

8  75.

9           Here, the court explained to the jury, with the approval of both parties, that the phone call

10  in fact did not come from the jail, and asked if any juror believed that the facts surrounding the

11  phone call would influence his or her impartiality or affect his or her ability to remain fair and

12  impartial.  (RT 2201-02.)  Petitioner has not presented any evidence that the trial judge failed to

13  adequately consider whether the jurors' ability to deliberate impartially was likely to be affected

14  by information regarding an alleged phone call.

15           Even if the trial judge had not conducted a sufficient investigation, petitioner cannot

16  show prejudiced.  Habeas relief is warranted only if the constitutional error at issue had a

17  "substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

18  Abrahamson, 507 U.S. 619, 638 (1993).  Petitioner has not pointed to any evidence that any

19  potential juror bias had any prejudicial effect on his/her verdict or ability to decide the case

20  solely on the evidence.

21           In light of the above, and after a thorough and independent review of the underlying

22  record, the court concludes that where petitioner does not allege jury tampering, did not request a

23  hearing, and through counsel, approved of the manner in which the court conducted its

24  investigation into a potential juror bias, the state court's denial of this claim is not contrary to, or

25  an unreasonable application of, clearly established federal law.

26           3.     CALJIC Nos. 1.00 and 17.41.1.

27           Petitioner claims that when the trial court instructed the jury to with CALJIC

28

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.Rmw\HC.06\Hall808den.wpd                         9

No.17.41.1[3], combined with CALJIC No. 1.00[4], it gave the improper impression that the jurors had to "police" each other, erroneously prompted the jurors to use evidence outside of the record during deliberations, and wrongly represented that the jurors would be subject to sanctions. (Petition at 3-1, 3-2.)

The Ninth Circuit has held that there is no "clearly established United States Supreme Court precedent" which establishes that an anti-nullification instruction such as CALJIC No. 17.41.1 violates a constitutional right. Brewer v. Hall, 378 F.3d 952, 955-56 (9th Cir. 2004 ). The court therefore held that a California appellate court's rejection of a challenge to 17.41.1 could not be contrary to, or an unreasonable application of, clearly established Supreme Court authority. Id. at 956.  In light of Brewer, that the trial court gave CALJIC No. 17.41.1 cannot be the basis for federal habeas relief.

     4.    Accomplice instruction

Petitioner claims that the trial court violated his right to due process and a fair trial by instructing the jury that Ryan was an accomplice because that instruction in essence directed the jury to determine that petitioner, and not Ryan, was the killer.  (Petition at 4-1.)  The instruction at issue was based on CALJIC No. 3.16 and read:  If the charged crime or any lesser included offense or any allegation was committed by anyone, the witness Ericka Ryan was an accomplice as a matter or law and her testimony is subject to the rule requiring corroboration.  (RT 971.)

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See Estelle v. McGuire, 502 U.S. 62, 72 (1991).  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the

---

   [3] CALJIC 17.41.1 provides:  The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on any other improper basis, it is the obligation of the other jurors to immediately advise the court of the situation.

   [4] CALJIC 1.00 provides: You must accept and follow the law as I state it to you, regardless of whether you agree with the law.

1  trial record.  See id.

2      In reviewing a faulty instruction, the court inquires whether there is a "reasonable

3  likelihood" that the jury has applied the challenged instruction in a way that violates the

4  Constitution.  Id. at 72, n.4.  If an error is found, the court must also determine that the error had

5  a "substantial and injurious effect or influence in determining the jury's verdict" before granting

6  relief in habeas proceedings.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

7      Here, the jury was not reasonably likely to interpret the instruction in the manner that

8  petitioner claims when viewed in the context of the overall charge.  See United States v.

9  Harrison, 34 F.3d 886, 889 (9th Cir. 1994).  The jury was instructed that an "accomplice is a

10  person who was subject to prosecution for the same crime with which the defendant is changed

11  by reason of aiding and abetting or being a member of a criminal conspiracy," see CALJIC 3.10;

12  that not all the instructions are applicable, depending on what facts the jury determined to be

13  true, see CALJIC 17.31 ("Disregard any instruction which applies to facts determined by you not

14  to exist.  Do not conclude that because an instruction has been given I am expressing an opinion

15  as to the facts."); and that, "if the charged crime or any lesser included offense or any allegation

16  were committed by anyone," Ryan was an accomplice, and her testimony required collaboration,

17  see CALJIC 3.16 (emphasis added).  See Morris v. Woodford, 273 F.3d 826, 834 (9th Cir. 2001)

18  (rejecting similar challenge to accomplice instruction).  The instructions correctly stated that if

19  Ryan had "any active role in the crime-including, of course, actually killing [the victim] - [her]

20  testimony required corroboration."  Id.  In light of the overall charge to the jury, there is no

21  "reasonable likelihood" that any juror would have understood the challenged instruction to

22  require the jury to find that petitioner was the killer and Ryan merely an accomplice.  See

23  Estelle, 502 U.S. at 702, n.4.  Therefore, there was no error, much less constitutional error.  See

24  id.

25      After a thorough and independent review of the underlying record, the court concludes

26  that the state court's rejection of petitioner's claim that the instruction regarding corroboration

27  by an accomplice violated his right to due process was not contrary to, or an unreasonable

28  application of, Supreme Court authority, nor was it based upon an unreasonable application of

1  the facts in light of the evidence presented.  28 U.S.C. § 2254 (d)(1), (2).

2      5.   Prosecutorial misconduct

3      Petitioner raises several claims that the prosecutor improperly placed the weight of the

4  government behind Ryan and against petitioner.  (Petition at 5-2.)  Specifically, he claims that

5  the prosecutor: (a) vouched for the credibility of Ryan; (b) questioned petitioner 18 times about

6  whether government witnesses were lying; (c) expressed his personal opinions about petitioner's

7  guilt; (d) called into question defense counsel's integrity and implied that the theory of defense

8  was a sham; and (e) argued to the jury that it was the jurors duty to find petitioner guilty.[5]

9  (Petition at 5-2.)

10      A.   Vouching

11      Petitioner claims that the prosecutor intimated he could vouch for Ryan's truthful

12  testimony and assure her veracity.  (Petition at 5-3 - 5-14.)  Petitioner points to the prosecutor's

13  statements to the jury that Ryan's guilty plea had a factual basis, and was conditioned on her

14  testifying truthfully.  (Petition at 5-5.)  Petitioner also asserts that the prosecutor claimed to have

15  "extra-record" knowledge of Ryan's truthfulness and that he was monitoring her testimony for

16  such truthfulness.  (Petition at 5-6, 5-8.)

17      Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate

18  standard of review is the narrow one of due process and not the broad exercise of supervisory

19  power.  See Darden v. Wainwright, 477 U.S. 168, 181 (1986).  A defendant's due process rights

20  are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  See id.

21  Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next

22  question is whether such conduct infected the trial with unfairness.  Tan v. Runnels, 413 F.3d

23  1101, 1112 (9th Cir. 2005).

24      A prosecutor may not vouch for the credibility of a witness.  United States v. Sanchez,

25  176 F.3d 1214, 1224 (9th Cir. 1999).  Improper vouching for the credibility of a witness occurs

26

27      _____

28      [5] Petitioner also claims that the prosecutor improperly used petitioner's exercise of his
    right to an attorney and right to remain silent against him at trial.  This claim is duplicated in
    petitioner's petition.  The court addresses this claim under Claim 7 below.

1   when the prosecutor places the prestige of the government behind the witness or suggests that

2   information not presented to the jury supports the witness' testimony. United States v. Parker,

3   241 F.3d 1114, 1119-20 (9th Cir. 2001). "To warrant habeas relief, prosecutorial vouching must

4   so infect the trial with unfairness as to make the resulting conviction a denial of due process."

5   Davis v. Woodford, 384 F.3d 628, 644 (9th Cir. 2004) (citation and internal quotation omitted).

6       Here, contrary to the petitioner's assertion, the prosecutor did not rely upon any "extra-

7   record" knowledge of Ryan's truthfulness. The prosecutor referred to Ryan's plea agreement in

8   his closing on rebuttal and orally read portions of the agreement into the record. (RT 2161-63.)

9   Further, the plea agreement had already been admitted into evidence as an exhibit without

10  objection. (RT 1199.) The prosecutor's reading of the plea agreement did not constitute

11  vouching as it was in response to defense counsel's closing argument in which he attacked

12  Ryan's credibility. See, e.g., United States v. Shaw, 829 F.2d 714, 716 (9th Cir. 1987) (noting

13  that it is "clear that references to requirements of truthfulness in plea bargains do not constitute

14  vouching when the references are responses to attacks on the witness' credibility because of his

15  plea bargain").

16      Petitioner argues that evidence of Ryan's polygraph examination, the prosecutor's

17  reference to the preliminary hearing, and Inspector Losey's testimony represented to the jury that

18  the prosecutor was monitoring Ryan's testimony for truthfulness. However, any evidence

19  regarding Ryan's polygraph examination was introduced during petitioner's testimony (RT

20  1278), the court instructed the jury to strike testimony referencing a polygraph examination (RT

21  1727), and the prosecutor neither introduced nor mentioned such an examination. Second,

22  although the prosecutor during his rebuttal closing argument mentioned a preliminary hearing as

23  being the factual basis for Ryan's plea, the court does not find it reasonable that the jury would

24  interpret that isolated statement of the preliminary hearing to mean that the prosecutor or the

25  court was monitoring Ryan's testimony. See Donnelly v. DeChristoforo, 416 U.S. 637, 647

26  (1974) (noting differences between isolated remarks and "consistent and repeated

27  misrepresentations" and suggesting that "a court should not lightly infer that a prosecutor intends

28  an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy

1  exhortation, will draw that meaning from the plethora of less damaging interpretations").

2  Finally, Inspector Losey's testimony that he never heard Ryan mention that she knew where the

3  victim's body was even though she had testified that she was able to point out where the body

4  was found neither demonstrates nor implies that either he or the prosecutor were monitoring

5  Ryan's testimony for truthfulness.  Accordingly, the court rejects petitioner's claim that the

6  prosecutor engaged in improper vouching.

7       Moreover, even assuming that the prosecutor committed error, the trial court instructed

8  the jurors several times that their decision was to be made on the basis of the evidence alone, and

9  that the arguments of counsel were not evidence.  <u>Darden</u>, 477 U.S. at 181-82.  Furthermore,

10  there is no evidence that any vouching so infected the trial with unfairness as to make the

11  resulting conviction a denial of due process.  <u>Davis</u>, 384 F.3d at 644.

12       Therefore, after a thorough and independent review of the underlying record, the court

13  concludes that the state court's rejection of petitioner's claim of improper vouching was not

14  contrary to, or an unreasonable application of, Supreme Court authority, nor was it based upon

15  an unreasonable application of the facts in light of the evidence presented.  28 U.S.C. § 2254

16  (d)(1), (2).

17       B.    <u>Questioned petitioner as to which witnesses were lying</u>

18       Petitioner claims that it was prejudicial error for the prosecutor to question him 18 times

19  as to whether petitioner believed government witnesses were lying.  (Petition at 5-15 - 5-17.)

20       Improper questioning of a witness by the prosecutor is not sufficient by itself to warrant

21  reversal.  <u>United States v. Moreland</u>, 509 F.3d 1201, 1213 (9th Cir. 2007) (quotation and citation

22  omitted).  In considering whether the questioning deprived the defendant of a fair trial, the

23  witness' testimony should be viewed as a whole to determine the impact of the improper

24  questioning.  <u>Ortiz v. Stewart</u>, 149 F.3d 923, 934 (9th Cir. 1998).  It is improper for a prosecutor

25  to question a defendant regarding the veracity of government witnesses.  <u>Moreland</u>, 509 F.3d at

26  1212; <u>see, e.g.</u>, <u>United States v. Sanchez</u>, 176 F.3d 1214, 1220-21, 1222, 1223-24 (9th Cir. 1999)

27  (improper where prosecutor elicited defendant's testimony that Marshal was a liar).

28       Applying the highly deferential standard of the AEDPA, the court concludes that the

1  prosecutor's questioning did not result in a violation of due process.  A review of the record

2  demonstrates that during petitioner's cross-examination, he suggested that government witnesses

3  were lying[6], to which the prosecutor followed up by asking petitioner which witnesses in

4  particular petitioner believed were lying[7][8].

5

6  _____

   [6] Specifically, petitioner stated, "The story you've heard by the other people is fictitious.
7  It never happened."  (RT 1469.)

8      [7]       Q: You said Mickey [Parsons] lied the other day in his testimony?
             A: Yes, sir.
9            Q: One of the lies would be, I guess, that he said there was a physical altercation
             that last evening when there was none?
10           A: Yes, sir.
             Q: What other lies did he tell?
11           A: I would say he gave a -- his rendition sitting up here, probably high on
             marijuana, about a choke hold that he had no idea how it worked, talking about
12           me squeezing when people exhale.  And that has nothing to do with anything, as
             you've heard from Detective Thiel or -- or the coroner or the pathologist.  People
13           can breathe and still pass out.
             Q: Sure.  Can you think of any other lies that -- that Mickey told while you were
14           sittin' down here at the end of the table and he was testifying at this trial?
             A: Sir, I would have to refer to notes, like you would understand.
15           Q: Nothing stands out as -- as something you remember as, whoa, that didn't
             happen; he's lying about that, as you sit here now?
16           A: Yes, sir.  Just like I was saying, many of those things did not happen.
             Q: But you can't think of anything that Mr. Parsons testified to as you sit there
17           right now that -- that occurred to you, that's a lie; that didn't happen?
             A: The fight.  That's a lie.  It didn't happen.
18           Q: Okay.  But nothing else?
19
20  (RT 1469-71.)
21
22      [8]       Q: You said just a few moments ago that some witnesses are making up a story as
             they testify?
23           A: Oh, yes, sir.
             Q: Who do you think is lying, Mr. Hall?
24           A: We just saw yesterday, Detective Losey misled you to believe that Ericka
             Ryan never told him where the body was.
25           Q: So, it's your testimony that Inspector Losey, this gentlemen right here, lied
             under oath yesterday?
26           A: During close, my attorney will go over these points and show you through
             transcripts, and time and time again, not only did she tell him, but a couple of
27           pages later, on page 20 and 21, he gives her the grid coordinates on a map and
             says, "This is where we found the man, this little spot right here."  Don't quote
28           me exactly, but that's pretty close, sir.

1   While it can be inappropriate in certain circumstances for prosecutors to ask a defendant

2   about the veracity of the testimony of government witnesses, here, the prosecutor's questions

3   followed up petitioner's own assertions that the government witnesses had given "fictitious"

4   testimony.  In such a context, the prosecutor's questions did not infect "the trial with unfairness

5   as to make the resulting conviction a denial of due process."  <u>Darden</u>, 477 U.S. at 181 (internal

6   quotation omitted).

7   With respect to the questioning about Parsons' lies, <u>Moreland</u> and <u>Sanchez</u> are factually

8

9   _____

10   Q: Anybody besides Inspector Losey lie?
      A: My -- my attorney will address those problems in close.
11   Q: I'm asking you, Mr. Hall, who else?
      A: I don't think you want to know, sir.  I can't speculate right now. . . . Yes.
12   Ericka Ryan has sat here and lied to you under oath time and time again.  And
      what is appalling is that you can allow this to go on, sir, knowing the truth.
13   Q: Besides Ericka Ryan and Inspector Losey, anybody else?
      A: Detective Thiel, when he was on the stand, said the word goatee.  You'll see
14   on my Kentucky ID that sometimes I do have a beard, much like possibly one in
      the jury.  Sometimes I have none.  My driver's license, or the ID, one of them I
15   have no beard; one of them I have a beard.  The word goatee was never
      mentioned in any statement by any witness ever.  It was, I think, intentionally
16   blurted out for helpful reasons to take all these smaller lies and make up a larger
      lie.
17   Q: In addition to Detective Thiel and Inspector Losey and Ericka Ryan, who else
      has been lying, Mr. Hall?
18   A: I would have to go through my notes, sir.
      Q: Nobody comes to mind right now?
19   A: No, I'd have to speculate.
      Q: What's your best recollection of who -- besides Inspector Losey and Detective
20   Theil and Ericka Ryan, what's your best recollection of the witnesses who have
      lied during this trial?
21   A: Lie is a word that I didn't want to lower myself to.  Name calling.  During our
      break I was called this numerous times by the District Attorney, a liar.  He's
22   using, I'd like to say, obfuscation, giving facts, but misleading you to believe in a
      way that he's trying to present 'em.  This is not possibly lying, is it criminal?
23   This will be decided after this, I'm sure.  But they are misleading facts and trying
      to, as we saw this morning, use anatomical names instead of what we were
24   actually looking for.  You were lulled into a trance about the prostate gland when
      we know what the actual reason was for the doctor to sit up here and be on the
25   stand.
      Q: Was the doctor lying, too?
26   A: No, sir.

27

28

(RT 1849-50.)

1    distinguishable.  In those cases, the Ninth Circuit emphasized that the prosecutor cannot force a

2    defendant to give his opinion on whether government witnesses were lying.  Here, the prosecutor

3    did not force petitioner to give his opinion on whether Parsons was a liar.  Petitioner offered up

4    that opinion of his own volition.  (RT 1469.)  After petitioner stated, "The story you've heard by

5    the other people is fictitious," the prosecutor merely asked petitioner to clarify that he was

6    referring to Parsons, and then asked petitioner specifically what statements he believed Parsons

7    lied about.  (RT 1469-71.)

8          With respect to the remaining line of questions (RT 1849-50), the prosecutor's questions

9    did not so infect the trial so as to make the conviction a denial of due process.  As petitioner

10   notes, the case hinged on credibility.  Given this, the court finds it highly unlikely that the

11   prosecutor's questions compromised the fairness or integrity of the trial.  The prosecutor's

12   questions simply allowed petitioner to present the defense petitioner presented throughout trial:

13   that the government witnesses were not being truthful. Petitioner points to nothing to suggest

14   that the prosecutor's accentuation of petitioner's sole theory of defense changed the outcome of

15   the trial or otherwise compromised its integrity.  Further, the jury was properly instructed that it

16   should not consider counsel's statements as evidence.

17         In addition, the court recognizes that, on direct appeals, the Ninth Circuit has held that a

18   prosecutor should not ask a defendant "were they lying?" questions.  See e.g., United States v.

19   Combs, 379 F.3d 564, 572 (9th Cir. 2004) (finding error plain and affecting substantial rights);

20   Sanchez, 176 F.3d at 1219-20 (declining to decide whether such error is plain or affected the

21   defendant's substantial rights).[9]  Moreover, this prohibition applies in the situation where

22   defendant's version of what happened is merely contrary to that of a government witness.  Here,

23   petitioner had already accused government witnesses of lying and being deceitful.  Further, a

24   state court's decision is not necessarily contrary to, or an unreasonable application of clearly

25   established federal law merely because there is federal circuit law that applies such principles

26   differently.  See Duhaime v. Ducharme, 200 F.3d 597, 602-03 (9th Cir. 2000).  It should also be

27

28         [9]  The court notes that the California Supreme Court has held that such questions may be
     appropriate and may not implicate a defendant's constitutional rights.  People v. Tafoya, 42 Cal.
     4th 147, 176-79 (2007); People v. Chatman, 38 Cal. 4th 344, 381-84 (2006) (same).

1    noted that the Ninth Circuit cases discussing "were they lying" questions involved direct appeals

2    of federal convictions; as such, they did not apply the deferential standard of review required by

3    the AEDPA.  In order to obtain federal habeas relief, there must be applicable "clearly

4    established" Supreme Court precedent.  <u>See</u> 28 U.S.C. § 2254(d)(1).  Petitioner cites no clearly

5    established Supreme Court precedent, and the court is aware of none providing that a

6    prosecutor's questioning a witness about the veracity of government witnesses may violate a

7    defendant's right to due process.  Because petitioner points to no controlling Supreme Court

8    precedent, and the court is unable to find one, <u>see</u> <u>Carey v. Musladin</u>, 127 S. Ct. 649, 653-54

9    (2006), and, after a thorough and independent review of the underlying record, the court

10   concludes that the state court's decision rejecting petitioner's claim of prosecutorial misconduct

11   is not contrary to, or an unreasonable application of, clearly established law.

12                     C.      <u>Expressed personal opinion about petitioner's guilt</u>

13          Petitioner claims the prosecutor wrongly expressed personal opinions about petitioner's

14   guilt.  (Petition at 5-19, 5-20.)  Specifically, petitioner cites to six examples in the prosecutor's

15   closing argument that he claims were improper:

16                  (1)     Let's make no mistake about it, this man right here . . . is a
                    murderer. (RT 2001.)
17                  (2)     I defy anyone to tell me that -- that the evidence doesn't establish
                    that -- that this is first degree murder . . . (RT 2027.)
18                  (3)     People had to prove, one, that a murder was committed; that the
                    murder was committed during the robbery; and that defendant was in fact
19                  the murderer . . . And we did what we set out to do. (RT 2029.)
                    (4)     We also know that somebody in this proceeding is not telling the
20                  truth.  Now, we can understand why the defendant would lie.  He doesn't
                    want to be convicted or punished for what he's done.  We can understand
21                  it, but we can't condone it. (RT 2033.)
                    (5)     He's a sociopath.  He is a man without a conscience, without a
22                  moral compass to guide him. (RT 2034.)
                    (6)     This is a search for the truth.  The truth is neutral.  The truth
23                  doesn't care who wins.  Truth doesn't care who loses.  Sometimes truth is
                    pleasant . . . Your verdict should be guilty as charged murder in the first
24                  degree with special circumstances. (RT 2036-37.)

25          A prosecutor may not express his personal opinion of the defendant's guilt.  <u>See</u> <u>United</u>

26   <u>States v. Younger</u>, 398 F.3d 1179, 1190 (9th Cir. 2005).  A prosecutor should not use the phrase

27   "we know" in summation to discuss evidence in summation; however, it is not improper as a

28   means of marshaling the evidence offered at trial.  <u>Id.</u> at 1191.  The prosecutor may, however,

1   make comments about the character of one who would commit the crime at issue.  See, e.g.,

2   Turner v. Marshall, 63 F.3d 807, 818 (9th Cir. 1995) (no due process violation arising from

3   prosecutor's comments that perpetrator of crime a "monster of a human being"), overruled on

4   other grounds by Tolbert v. Page, 182 F.3d 677, 685 (9th Cir. 1999) (en banc).

5          A review of the transcripts and the prosecutor's comments in context demonstrate that

6   these phrases were used to "marshal evidence actually admitted at trial and reasonable inferences

7   from that evidence, not to vouch for witness veracity or suggest that evidence not produced

8   would support a witness's statements."  Younger, 398 F.3d at 1191.  As such, they were not

9   improper and habeas relief is inappropriate.  See Darden, 477 U.S. at 181.

10          Therefore, after a thorough and independent review of the underlying record, the court

11   concludes that the state court's rejection of this claim was not contrary to, or an unreasonable

12   application of, Supreme Court authority, nor was it based upon an unreasonable application of

13   the facts in light of the evidence presented.  28 U.S.C. § 2254 (d)(1), (2).

14                    D.    Calling into question defense counsel's integrity

15          Petitioner claims that the prosecutor called into question defense counsel's integrity, in

16   violation of petitioner's right to due process.  Petitioner argues that the prosecutor should not

17   have (1) told the jury that it was counsel's job to "get petitioner off" and (2) implied to the jurors

18   that counsel engaged in the production of perjury by using the discovery received from the

19   government to make up petitioner's testimony along the way.  (Petition at 5-28.)

20          Specifically, petitioner complains about this portion of the prosecutor's comments:

21                It is fair during this portion of the trial for the attorneys to comment on
                  both the law and the evidence.  And that's because we have differing
22                roles in this proceeding.  An attorney is an advocate.  He is a proponent
                  of one side or the other.  He is trying to persuade you that both the law
23                and the evidence support his particular position.  Keep that in mind.  It is
                  my job, if I can, to convince you that the evidence establishes beyond a
24                reasonable doubt that the charge against the defendant is true.  And it's
                  Mr. Eannarino's job, if he can, to get his client off.  So, as you listen to
25                us, as you listen to the argument, understand we are not neutral; we are
                  trying to convince, trying to persuade.
26
     (RT 2003.)
27
            While petitioner is correct that a prosecutor engages in misconduct if he calls the defense
28
     a sham, see United States v. Sanchez, 176 F.3d 1214, 1224 (9th Cir. 1999), a review of the trial

1    transcript here reveals that the prosecutor's remarks in context neither attacked counsel's

2    integrity nor remarked that the defense was a sham.  (RT 2003, 2172.)  The court finds that the

3    prosecutor's brief remarks did not so infect the trial with unfairness.  See Darden, 477 U.S. at

4    181.

5            Accordingly, after a thorough and independent review of the underlying record, the court

6    concludes that the state court's rejection of this claim was not contrary to, or an unreasonable

7    application of, Supreme Court authority, nor was it based upon an unreasonable application of

8    the facts in light of the evidence presented.  28 U.S.C. § 2254 (d)(1), (2).

9                    E.    Argument that jurors had to find petitioner guilty

10           Petitioner claims the prosecutor committed prejudicial misconduct when he told the jury

11   it was their duty to find him guilty (Petition at 5-30), and inflamed the passions and prejudices of

12   the jury by commenting on Schauer's "bereaved family," (Petition at 5-31).

13           An appeal to the jury to act as the conscience of the community is not impermissible

14   unless it is specifically designed to inflame the jury.  United States v. Lester, 749 F.2d 1288,

15   1301 (9th Cir. 1984).  Any error is not reversible, however, if the judge gives a curative

16   instruction that counsel's arguments are not evidence and that the jury's only job is to determine

17   guilt or innocence from the evidence in the case.  See United States v. Polizzi, 801 F.2d 1543,

18   1558 (9th Cir. 1986).

19           Here, there is no evidence that the prosecutor's brief mention of the testimony of the

20   victim's wife was "specifically designed to inflame the jury."  (RT 2030)[10].  Further, a review of

21   the closing argument statements in context demonstrates that the prosecutor did not, in fact, tell

22   the jury it was their "duty" to convict petitioner.  The prosecutor reminded the jury that it was

23   their duty to find the facts and use the law as given to them to determine their verdict.  (RT

24   2187.)  Nevertheless, even assuming any comment was improper, the judge gave appropriate

25   curative instructions that counsel's arguments were not evidence and the jury should decide the

26

27           [10]  "And [petitioner's] testimony in this case makes superfluous the testimony of many of

28   the witnesses who were called during the People's case in chief.  He does not now dispute that
     David Schauer was a human being.  So Kathy Howell's identification of David, of David as her
     friend and the father of her two children, is no longer at issue, not being contested."  (RT 2030.)

1 | case only based on the evidence presented to it.  (RT 1955-56.)  Accordingly, the court finds that

2 | the prosecutor's brief remarks did not so infect the trial with unfairness.

3 |     After a thorough and independent review of the underlying record, the court concludes

4 | that the state court's rejection of this claim was not contrary to, or an unreasonable application

5 | of, Supreme Court authority, nor was it based upon an unreasonable application of the facts in

6 | light of the evidence presented.  28 U.S.C. § 2254 (d)(1), (2).

7 |         6.      Ineffective Assistance of Appellate Counsel

8 |     Petitioner contends that his appellate counsel rendered ineffective assistance by failing to

9 | raise the above five issues in his direct appeal.  (Petition at 6-1.)

10 |     Claims of ineffective assistance of appellate counsel are reviewed according to the

11 | standard set out in Strickland v. Washington, 466 U.S. 668 (1984).  See Miller v. Keeney, 882

12 | F.2d 1428, 1433 (9th Cir. 1989).  A defendant therefore must show that counsel's representation

13 | did not meet an objective standard of reasonableness and that there is a reasonable probability

14 | that, but for counsel's unprofessional errors, he would have prevailed on appeal.  See id. at 1434

15 | & n.9 (citing Strickland, 466 U.S. at 688, 694).

16 |     It is important to note that appellate counsel does not have a constitutional duty to raise

17 | every nonfrivolous issue requested by defendant.  See Jones v. Barnes, 463 U.S. 745, 751-54

18 | (1983).  The weeding out of weaker issues is widely recognized as one of the hallmarks of

19 | effective appellate advocacy.  See Miller, 882 F.2d at 1434.  Appellate counsel therefore will

20 | frequently remain above an objective standard of competence and have caused his client no

21 | prejudice for the same reason - because he declined to raise a weak issue.  Id.

22 |     Petitioner's claim is without merit.  As discussed above, there is no merit to the first five

23 | claims petitioner raised in his § 2254 petition.  Because those claims were meritless, appellate

24 | counsel's failure to raise the issues on appeal could not have resulted in prejudice to petitioner.

25 | Furthermore, because the underlying claims are without merit, their weeding out by appellate

26 | counsel may constitute an instance of effective advocacy, as defined in Miller.

27 |     After a thorough and independent review of the underlying record, the court concludes

28 | that the state court's rejection of petitioner's claim of ineffective assistance of appellate counsel

1    was not contrary to, or an unreasonable application of, Supreme Court authority, nor was it based

2    upon an unreasonable application of the facts in light of the evidence presented.  28 U.S.C.

3    § 2254 (d)(1), (2).

4            7.    Doyle claim

5            Petitioner claims that the prosecutor violated his right to due process by asking a question

6    on cross-examination and by making a comment in closing argument about petitioner's post-

7    Miranda silence, in violation of Doyle v. Ohio, 426 U.S. 610 (1976).  (Petition at 9-1 - 9-5.)  The

8    prosecutor argued that he was entitled to put on rebuttal evidence during cross-examination in

9    order to show that petitioner had stopped speaking to the police because he had requested an

10   attorney, and to refute the impression from petitioner's testimony that he had stopped talking to

11   the police because the police believed he had no further information about the crimes.[11]  (Petition

12   at 9-2.)  The prosecutor further commented on petitioner's invocation of his right to counsel in

13   closing argument stating, "the conversation ended when he asked to speak with an attorney."

14   (Petition at 9-3.)

15           The state appellate court denied this claim both on procedural and substantive grounds.

16   First, it concluded that petitioner waived this claim by failing to object to it at trial.  (Resp. Ex. I,

17   p. 20-21.)  Although counsel initially objected to the prosecutor's questioning, counsel objected

18   on the basis of relevance and not on any constitutional ground.  (Id.)  Alternatively, the court

19   also concluded that, nevertheless, the admission of petitioner's invocation of counsel was

20   harmless.  (Id. at 21-23.)

21           In cases in which a state prisoner has defaulted his federal claims in state court pursuant

22   to an independent and adequate state procedural rule, federal habeas review of the claims is

23

24   [11]  Q: -- you told them that whatever Ericka said was what happened, didn't you?
     A: Yes, sir.  Before they had talked to me, again, Ericka Ryan had left the interview room

25   crying, and I had seen that.  When they then asked me to talk to 'em, I went in and said,
     whatever Ericka Ryan says is what happened.

26   Q: And you said that more than once, didn't you?
     A: I might have said it twice.

27   Q: And then you told them that you wanted an attorney?
     A: Yes.  I -- I think I said I do not want to talk anymore.

28

1   barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result

2   of the alleged violation of federal law, or demonstrate that failure to consider the claims will

3   result in a fundamental miscarriage of justice.  See Coleman v. Thompson, 501 U.S. 722, 750

4   (1991). The Ninth Circuit has recognized and applied the California contemporaneous objection

5   rule in affirming the denial of a federal petition on grounds of procedural default where there

6   was a complete failure to object at trial, see Inthavong v. Lamarque, 420 F.3d 1055, 1058 (9th

7   Cir. 2005), and also where, as here, the petitioner raised only an evidentiary, not a constitutional

8   objection, at trial, see Davis v. Woodford, 384 F.3d 628, 653-54 (9th Cir. 2004).

9       Having determined that California's contemporaneous objection rule is an independent

10  and adequate procedural bar, the court turns to whether petitioner demonstrates cause and

11  prejudice for the default.  See Coleman, 501 U.S. at 750.   Here, petitioner's only reason for

12  failing to timely object was based on an allegation that counsel was ineffective.  (Petition at 9-4.)

13  However, counsel's mere failure to recognize the factual or legal basis for a claim, or failure to

14  raise the claim despite recognizing it, does not constitute cause.  See Murray v. Carrier, 477 U.S.

15  478, 486 (1986).  To serve as "cause," the claim of ineffective assistance of counsel must have

16  been presented as an independent claim to the state courts.  See id. at 489.  A procedurally

17  defaulted ineffective assistance of counsel claim is not cause to excuse the default of another

18  habeas claim unless the petitioner can satisfy the cause and prejudice standard with respect to the

19  ineffective assistance of counsel claim itself.  See Edwards v. Carpenter, 529 U.S. 446, 451

20  (2000).  Here, petitioner not only failed to raise ineffective assistance of counsel as an

21  independent claim to the state courts, but he also failed to demonstrate cause and prejudice for

22  neglecting to raise such ineffective assistance of counsel claim.  See id.

23      Alternatively, even assuming petitioner's claim is not procedurally barred, the court

24  concludes that there was no Doyle error, and accordingly, the state court's decision is not

25  contrary to or an unreasonable application of Supreme Court law.

26      The government may not use a defendant's silence "at the time of arrest and after

27  receiving Miranda warnings" to impeach the defendant's exculpatory testimony at trial.  Doyle

28  v. Ohio, 426 U.S. 610, 619 (1976).  Overbroad questioning and closing argument that encompass

1   post-Miranda silence violate Doyle.  See United States v. Lopez, 500 F.3d 840, 844 (9th Cir.

2   2007) (Doyle error occurred when prosecutor asked defendant whether he ever mentioned his

3   excuse to a border patrol agent because defendant had been processed and given Miranda rights

4   by that agent; the questioning (as well as related closing argument) covered permissible and

5   impermissible periods).

6       Here, the admission of petitioner's response to the prosecutor's question and the

7   prosecutor's comment regarding petitioner's request for counsel did not violate petitioner's Fifth

8   Amendment rights because the prosecutor's question was a "fair response" to petitioner's

9   testimony.  On direct, the petitioner's testimony gave the impression that the police stopped

10  asking questions because petitioner did not want to implicate Ryan and that the police should

11  question Ryan on the specific details of the crime.  On cross-examination, the prosecutor did not

12  treat petitioner's silence as evidence of substantive guilt, but instead elicited testimony from

13  petitioner that petitioner invoked his right to counsel and to remain silent in order to explain to

14  the jury why petitioner did not answer any more questions.  See United States v. Robinson, 485

15  U.S. 25, 32 (1987) ("Where the prosecutor on his own initiative asks the jury to draw an adverse

16  inference from a defendant's silence, . . . the privilege against compulsory self-incrimination is

17  violated.  But where as in this case the prosecutor's reference to the defendant's opportunity to

18  testify is a fair response to a claim made by defendant or his counsel, we think there is no

19  violation of the privilege."); United States v. Scholl, 166 F.3d 964, 976 (9th Cir. 1999)

20  (questions regarding why the defendant did not provide information to the government were not

21  misconduct running afoul of Doyle v. Ohio, 426 U.S. 610 (1976), because the defendant claimed

22  that he was never given the opportunity to present documents or cooperate as he had requested).

23      Furthermore, even assuming error, the state appellate court found the following:

24          In any event we are satisfied that introduction of defendant's request
        for counsel was harmless beyond a reasonable doubt.  The only prejudicial
25      tendency of the evidence was to suggest consciousness of guilt.  But the jury
        was virtually certain to draw such an inference anyway from numerous other
26      matters in evidence.  The first and most dramatic of these was defendant's
        attempted suicide the day before the interview.  Defendant sought to
27      minimize th seriousness of this attempt on the witness stand, but he
        affirmatively testified that he had thoughts of suicide both before and after
28      his arrest.  The jury was unlikely to find his explanation for these thoughts to
        be nearly as persuasive as the premise that he was guilty of killing Schauer.

1
2
3
4
5
6
7
8
9
10
11
12

        The jury was also likely to infer consciousness of guilt from the admittedly false statements defendant made to officers and the implausibility of his explanation for his failure to tell them that Ryan was the killer. Defendant claimed that he trusted Ms. Ryan to confess, as she had repeatedly promised to do in the event of apprehension.  But defendant's mere belief that she would confess hardly furnished a plausible reason for him to tell police affirmatively, as he did, that Ryan "never done anything, but just be there for me," And "Erica's done nothin['], but stay by my side . . ." Defendant's version of events conspicuously lacked an affirmative motive for him to mislead police -- thereby exposing himself to possibly severe consequences -- when he could have simply corroborated what he believed Ryan was already telling them, i.e., that she had killed the man they were asking about.  No such motive appears on this record.  Defendant suggested in cross-examination that he was "being evasive" with the officers because he "didn't want to tell on" Ryan, but he claimed no feelings which might explain this preference.  On the contrary, eh testified that he had "no strong emotional ties" to her.  Nor would there by any apparent point in lying to protect her if in fact she was in the process of confessing.  Defendant's explanation for the inconsistencies between his statements to the officers and his testimony at trial makes so little sense that the jurors were highly unlikely to credit it under any circumstances.  And if the jury rejected defendant's explanation of his supposed lies to the officers, they were left with only one other explanation: he was lying at trial when he painted Ryan as the killer.

13
14
15

        We are satisfied beyond a reasonable doubt that the jury would not have accepted defendant's version of events, but would instead have found defendant guilty beyond a reasonable doubt, whether or not it learned that defendant terminated the August 30 interrogation by invoking his right to counsel.

16
(Resp. Ex. I, p. 21-23.)

17
      The prosecution mentioned petitioner's invocation of the right to counsel once during

18
questioning, and once during closing argument.  (RT 1534, 2032.)  Based on the persuasive

19
reasoning of the state court, this court cannot conclude that any error had a "substantial and

20
injurious effect" on the jury's verdict.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

21
(internal quotation marks and citation omitted).

22
      Accordingly, the court concludes that the state appellate court's decision was not

23
contrary to, or an unreasonable application of clearly established federal law, nor was it an

24
unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. §

25
2254(d)(1), (2).

26
        8.    Impeachment using custodial statements

27
      Petitioner alleges that his statements to the police were involuntary and in violation of

28
Miranda, as found by the trial court, and therefore, the prosecution should not have been

1    permitted to use those statements against him on cross-examination or for any purpose. (Petition

2    at 10-1 - 10-6.)

3          At trial, the court held a suppression hearing to determine whether statements petitioner

4    made while in custody were taken in violation of <u>Miranda</u>. The trial court granted petitioner's

5    motion to suppress on the ground that he had not waived his <u>Miranda</u> rights. The court further

6    stated that in the event petitioner testified, portions of his statements could come in. However,

7    the court did not explicitly rule on whether or not petitioner's statements were voluntarily made.

8    At trial, petitioner testified about the circumstances surrounding his custodial interrogation,

9    including his own version of what happened at the interrogation. At the conclusion of his

10   testimony, the prosecution indicated that it wished to play the tape of petitioner's interview in

11   light of petitioner's "opening the door" to those circumstances. Counsel for defendant conceded

12   that he did open the door to that line of questioning and that it was intentional. Both parties

13   stipulated to admitting the recording of the interview as well as a copy of the transcript.

14         Involuntary confessions in state criminal cases are inadmissible under the Fourteenth

15   Amendment. <u>Blackburn v. Alabama</u>, 361 U.S. 199, 207 (1960); <u>Henry v. Kernan</u>, 197 F.3d

16   1021, 1028 (9th Cir. 1999) (noting that involuntary confessions are inadmissible for

17   impeachment). Voluntary statements taken in violation of <u>Miranda</u>, on the other hand, may be

18   used to impeach the defendant's credibility even though they are inadmissible as evidence of

19   guilt and are limited to collateral matters. <u>See</u> <u>Harris v. New York</u>, 401 U.S. 222, 225 (1971).

20   The voluntariness of a confession is evaluated by reviewing both the police conduct in extracting

21   the statements and the effect of that conduct on the suspect. <u>Miller v. Fenton</u>, 474 U.S. 104, 116

22   (1985). Absent police misconduct causally related to the confession, there is no basis for

23   concluding that a confession was involuntary in violation of the Fourteenth Amendment.

24   <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986).

25         To determine the voluntariness of a confession, the court must consider the effect that the

26   totality of the circumstances had upon the will of the defendant. <u>Schneckloth v. Bustamonte</u>,

27   412 U.S. 218, 226-27 (1973). "The test is whether, considering the totality of the circumstances,

28   the government obtained the statement by physical or psychological coercion or by improper

1    inducement so that the suspect's will was overborne." United States v. Leon Guerrero, 847 F.2d

2    1363, 1366 (9th Cir. 1988).  The assessment of the totality of the circumstances may include

3    consideration of the length and location of the interrogation; evaluation of the maturity,

4    education, physical and mental condition of the defendant; and determination of whether the

5    defendant was properly advised of his Miranda rights.  Withrow v. Williams, 507 U.S. 680, 693-

6    94 (1993).

7         The state appellate court rejected this claim and concluded that petitioner's statements

8    were voluntary, and therefore, admissible for impeachment purposes.  (Resp. Ex. I., p. 14-18.)

9    The state court relied on factors such as petitioner's maturity, his good physical condition; the

10   absence of any medical or drug-related impairment; the relative brevity of the questioning; and

11   the fact that the statements were made after a proper Miranda warning which petitioner said he

12   understood.  (Id. at 14.)

13        A review of the interview and the record in this case demonstrates that petitioner's

14   statements were voluntarily given.  Although petitioner compares his situation to those facts

15   given in Henry v. Kernan, 197 F.3d 1021 (9th Cir. 1999), the record belies his assertions.  In

16   Henry, even after the petitioner repeatedly asked for counsel, the police continued to ask

17   questions in order to elicit responses.  Further, in Henry, the transcript "reveal[ed] a confused

18   and frightened defendant who garbled his sentences, was frequently inaudible, and was often

19   entirely incoherent for long passages."  Id. at 1027, fn.3.  By the end of the interview, the

20   defendant was sobbing, and throughout the interview, the defendant was confused, shaken,

21   frightened, and crying.  Id.

22        In contrast here, although petitioner did not waive his Miranda rights after he was

23   advised of them, the police ceased questioning the moment petitioner requested counsel.

24   Further, contrary to petitioner's assertions, he never stated he did not wish to answer any more

25   questions.  See Amaya-Ruiz v. Stewart, 121 F.3d 486, 494 (9th Cir. 1997) (noting that

26   encouraging a suspect to tell the truth does not amount to coercion).  In addition, petitioner's

27   interrogation lasted less than one hour, his statements did not confess any involvement with the

28   crime, and his apparent confusion or tiredness did not appear to be suggestive of a vulnerability

1   to coercion.  See Cunningham v. Perez, 345 F.3d 802, 810-11 (9th Cir. 2003).  Accordingly, a

2   review of the totality of the circumstances reveals that petitioner's statements were not obtained

3   through improper coercion so that his will was overborne.  See Schneckloth, 412 U.S. at 226-27.

4        The court concludes that the state court's decision rejecting this claim was not contrary

5   to, or an unreasonable application of clearly established federal law, nor was it an unreasonable

6   determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1), (2).

7        9.    Confrontation Clause

8        Petitioner claims that the trial court's prohibition of Ryan's cross-examination in four

9   separate areas violated his right to confrontation and the compulsory process.  (Petition at 11-1 -

10  11-3.)  Specifically, he alleges that the trial court should have allowed him to question Ryan

11  regarding: (1) whether her husband had a basis for his fears regarding her marital fidelity; (2) her

12  abuse of drugs prior to March 1999; (3) the details she gave to police on a crime scene visit; and

13  (4) whether petitioner "rolled his eyes" when she asked him to choke someone.  Petition at 11-1.

14  In addition, petitioner claims that the court quashed his subpoena to access Ryan's psychiatric

15  records, in violation of the Confrontation Clause and compulsory process.  (Petition at 11-1.)  As

16  a result, petitioner asserts that these prohibitions stifled his ability to produce a different

17  impression of Ryan's credibility.  (Petition at 11-3.)

18       The Confrontation Clause does not prevent a trial judge from imposing reasonable limits

19  on cross-examination based on concerns of harassment, prejudice, confusion of issues, witness

20  safety or interrogation that is repetitive or only marginally relevant.  Delaware v. Van Arsdall,

21  475 U.S. 673, 679 (1986).  The Confrontation Clause guarantees an opportunity for effective

22  cross examination, not cross examination that is effective in whatever way, and to whatever

23  extent, the defense might wish.  See Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam).

24  A defendant meets his burden of showing a Confrontation Clause violation by showing that "[a]

25  reasonable jury might have received a significantly different impression of [a witness']

26  credibility . . . had counsel been permitted to pursue his proposed line of cross-examination."

27  Van Arsdall, 475 U.S. at 680.  The focus of this inquiry "must be on the particular witness, not

28  on the outcome of the entire trial."  Id.

1    The state appellate court rejected this claim.  As to the limitations on cross-examination,

2    the state appellate court noted that petitioner made no substantive arguments supporting his

3    claims.  Nevertheless, the appellate court concluded that, with respect to the question regarding

4    fidelity, the trial court properly sustained an objection based on relevancy and California

5    Evidence Code § 352.  (Resp. Ex. I, p. 23.)  As to the question regarding Ryan's drug abuse prior

6    to 1999, the state appellate court noted that, based on relevancy grounds (RT 794), the trial court

7    properly limited questioning regarding drug abuse to Ryan's time with petitioner.  (Resp. Ex. I,

8    p. 24.)  As to the last two questions, the appellate court concluded that petitioner proffered no

9    argument as to why those questions should have been allowed over sustained hearsay objections.

10   (Id.)

11       While it is true that "evidentiary privileges or other state laws must yield if necessary to

12   ensure the level of cross examination demanded by the Sixth Amendment," Murdoch v. Castro,

13   365 F.3d 699, 702-03 (9th Cir. 2004), petitioner fails to demonstrate how any of the four barred

14   areas of cross-examination would have exposed the jury to facts upon which the jury could have

15   drawn appropriate inferences regarding Ryan.  See Van Arsdall, 475 U.S. at 680; see also Jones

16   v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995) (stating that conclusory allegations are not

17   sufficient to support habeas relief).

18       A review of the record demonstrates that, with respect to the question of fidelity, Ryan

19   did answer defense counsel's question in the affirmative that she had had an extramarital affair at

20   the time her husband was concerned about her infidelity.  (RT 790.)  With respect to Ryan's drug

21   abuse, although the trial court prohibited questions regarding her drug use prior to March 1999,

22   defense counsel was allowed to explore her drug abuse involving crack and alcohol beginning

23   from March 1999 and beyond.  (RT 794-99.)  Petitioner fails to explain what about Ryan's drug

24   use prior to March 1999 would have changed the jury's outlook.  With respect to Ryan's

25   statements to the police during a visit to the crime scene, defense counsel had asked Ryan to

26   detail what she told police that day, upon which the trial court sustained a hearsay objection.

27   (RT 814.)  Thereafter, defense counsel ceased his questioning regarding the visit to the crime

28   scene.  (RT 814-15.)  It appears from the record that the trial court did not prohibit any

1   discussion regarding what counsel could ask about the visit to the crime scene; it merely

2   prohibited the form of that particular question.  (RT 814.)  Finally, with respect to the comment

3   regarding choking, the record shows that although Ryan was not permitted to answer the

4   question presented based on a sustained hearsay objection, defense counsel had already made his

5   point of refuting Ryan's assertions that petitioner was the one "in charge," and that she was

6   merely a follower.  (RT 833-35.)  Accordingly, the cited limitations on cross-examination did

7   not prevent the jury from making reasonable inferences from the evidence to the extent the

8   evidence was relevant.

9         With respect to petitioner's claim that the court quashing of the production of Ryan's

10  psychiatric records, it appears that petitioner is referring to the records of defense consultant

11  Berg.[12]  Specifically, petitioner argues that the trial court should have examined Ryan's

12  psychiatric records in chambers and subsequently disclosed to the defense any information that

13  bore on Ryan's credibility.   (Petition at 11-2, 11-3.)

14        The Compulsory Process Clause of the Sixth Amendment preserves the right of a

15  defendant in a criminal trial to have compulsory process for obtaining a favorable witness.  The

16  right to compulsory process is not absolute, however.  See Taylor v. Illinois, 484 U.S. 400, 410

17  (1988).  The Sixth Amendment right to present relevant testimony may, in appropriate cases,

18  bow to accommodate other legitimate interests in the criminal trial process.  See Rock v.

19  Arkansas, 483 U.S. 44, 56 (1987).  The Clause, for example, applies only to testimony that is

20  both material and favorable to the defense.  See United States v. Valenzuela-Bernal, 458 U.S.

21  858, 867, 873 (1982).[13]  The accused's compulsory process rights also may be limited by

22  evidentiary rules, see Perry v. Rushen, 713 F.2d 1447, 1453-54 (9th Cir. 1983) (no violation of

23

24        [12]  The court notes that two of the three packets of Ryan's medical/psychiatric records

25  which were produced were indeed reviewed in camera by the trial court and deemed immaterial
    for purposes of implicating Ryan's credibility or involvement in prostitution.  (Resp. Ex. I, p.

26  25.)

27        [13]  The Due Process Clause also does not guarantee the right to introduce all relevant

28  evidence to present a defense.  See Montana v. Egelhoff, 518 U.S. 37, 42 (1996).  A defendant
    does not have an unfettered right to offer evidence that is incompetent, privileged or otherwise
    inadmissible under standard rules of evidence.  See id.

1  compulsory process to prohibit evidence of third party identity because evidence collateral and

2  state interest in evidentiary rule overriding).

3         The state appellate court rejected petitioner's confrontation and compulsory process

4  claims with regard to the medical records.  It agreed with the trial court's assessment that

5  consultant Berg's records fell under both the attorney-client privilege and psychotherapist-

6  patient privilege; that the defense made no showing of materiality; and there was no

7  demonstration of a compelling showing of need to overcome the privilege.  (Resp. Ex. I, p. 26-

8  27.)

9         A review of the record demonstrates that petitioner failed to demonstrate that the

10  requested records were material or favorable to the defense.  In Pennsylvania v. Ritchie, 480

11  U.S. 39 (1987), upon which petitioner relies, the Supreme Court determined that, under a due

12  process analysis, disclosure of Children and Youth Services ("CYS") records in a child abuse

13  case was limited.  See id. at 57-58.  The Supreme Court remanded to the trial court to review

14  those records in camera.  Id. at 58.  It also noted, however, that the defendant "may not require

15  the trial court to search through the CYS file without first establishing a basis for his claim that it

16  contains material evidence."  Id. at 58, n.15 (citing United States v. Valenzuela-Bernal, 458 U.S.

17  858, 867 (1982) ("He must at least make some plausible showing of how their testimony would

18  have been both material and favorable to his defense.").

19         Here, petitioner failed to show that the records contained information that was material to

20  his case.  See United States v. Bagley, 473 U.S. 667, 682 (1985).  Petitioner requested

21  production of psychiatric records on the basis that they "might contain unspecified information

22  bearing on Ryan's credibility as a witness or might contain some evidence of her engaging in

23  prostitution."  Because petitioner's proffer was insufficient to demonstrate that the information

24  he sought was material, see id., he is not entitled to habeas relief on this issue.

25         Furthermore, Ritchie expressed no opinion on whether an in camera review would be

26  warranted if the information sought was protected by an absolute state privilege.  See Ritchie,

27  480 U.S. at 57 and n.14; see also People v. Gurule, 28 Cal. 4th 557, 594 (2002) ("We have held

28  that a criminal defendant's right to due process does not entitle him to invade the attorney-client

1    privilege of another.").  As the Supreme Court has not clearly established such a ruling on this

2    issue, the state court's decision necessarily cannot be contrary to or an unreasonable application

3    of federal law.  See 28 U.S.C. § 2254(d).

4         Accordingly, the court concludes that the state appellate court's decision regarding an

5    alleged violation of confrontation and the compulsory process was not contrary to, or an

6    unreasonable application of clearly established federal law, nor was it an unreasonable

7    determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1), (2).

8              10.   "Other crimes" evidence

9         Petitioner claims that, over objection, and in violation of his due process rights, the trial

10   court allowed the prosecution to introduce evidence that (1) petitioner left Kentucky for

11   California in order to avoid the outstanding warrants for his arrest for being in arrears in child

12   support payments, and (2) Ryan's statement that petitioner planned to kidnap her San Francisco

13   employer, Ms. Norris.  (Petition at 12-1.)

14        A state court's evidentiary ruling is not subject to federal habeas review unless the ruling

15   violates federal law, either by infringing upon a specific federal constitutional or statutory

16   provision or by depriving the defendant of the fundamentally fair trial guaranteed by due

17   process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984).  Failure to comply with state rules of

18   evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due

19   process grounds.  See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999).  The due process

20   inquiry in federal habeas review is whether the admission of evidence was arbitrary or so

21   prejudicial that it rendered the trial fundamentally unfair.  See Walters v. Maass, 45 F.3d 1355,

22   1357 (9th Cir. 1995).  But note that only if there are no permissible inferences that the jury may

23   draw from the evidence can its admission violate due process.  See Jammal v. Van de Kamp, 926

24   F.2d 918, 920 (9th Cir. 1991).

25        The state appellate court rejected petitioner's claim on appeal.  It stated that although the

26   trial court granted a defense motion in limine to exclude evidence of the outstanding Kentucky

27   warrant for nonpayment of child support, several witnesses, including petitioner himself, alluded

28   to and mentioned the warrant in testimony, without objection from counsel.  (Resp. Ex. I, p. 28-

1  29.) Without objection, stated the state court, such claim was not properly before the court on

2  review. (Resp. Ex. I, p. 29.) With respect to testimony regarding petitioner's plan to kill Ryan's

3  employer, the state court rejected the claim because petitioner failed to point to any specific

4  instance or court ruling excluding such evidence. (Resp. Ex. I, p. 29-30.)

5        Although prior bad acts evidence cannot be used to demonstrate a criminal

6  predisposition, such evidence is admissible for purposes of proving other relevant facts,

7  including motive, identity, knowledge, opportunity, intent, and lack of accident or mistake. See,

8  e.g., United States v. Hadley, 918 F.2d 848 (9th Cir. 1990) (approving use of evidence that the

9  defendant performed similar acts of sexual gratification on previous victims). Moreover, a

10  defendant cannot complain about the admission of bad acts evidence when he himself opens the

11  door, either by introducing the subject or by advancing a theory that makes his prior acts relevant

12  on an issue other than criminal propensity. See, e.g., United States v. Sarault, 840 F.2d 1479,

13  1485-86 (9th Cir. 1988) (holding other crimes evidence admissible, even in the prosecution's

14  case-in-chief, when relevant to refute a defense that the accused clearly intends to advance);

15  United States v. Bailleaux, 685 F.2d 1105, 1110 (9th Cir. 1982) (permitting the government to

16  inquire into the facts underlying a prior conviction where the defendant first testified about the

17  crime on direct examination). Here, because petitioner failed to object to the testimony and

18  "opened the door" to testimony regarding the child support payments, he is not entitled to habeas

19  relief.

20        With respect to the admission of petitioner's planned robbery, petitioner's petition

21  expounds no more substance than in his state pleadings. Without specificity or substantive

22  argument, petitioner cannot be entitled to habeas relief. See Jones v. Gomez, 66 F.3d 199,

23  204-05 (9th Cir. 1995) (stating that conclusory allegations are not sufficient to support habeas

24  relief).

25        Moreover, the Supreme Court has expressly left open the question of whether

26  introduction of other crimes evidence for the purpose of demonstrating propensity would offend

27  due process principles. See Alberni v. McDaniel, 458 F.3d 860, 862-64 (9th Cir. 2006).

28  Accordingly, the court concludes that the state appellate court's decision was not contrary to, or

1 | an unreasonable application of clearly established federal law, nor was it an unreasonable

2 | determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1), (2).

3 |     11.    Exclusion of polygraph test results

4 |     Petitioner complains that the trial court's exclusion of polygraph test results violated his

5 | due process and deprived him of a meaningful opportunity to present a complete defense.

6 | (Petition at 13-1 - 13-3.)  Specifically, he states that prior to trial, Ryan failed a polygraph test

7 | given to her by the police.  During petitioner's direct testimony, he mentioned the failed

8 | polygraph test and the government did not object.  A few weeks later, the government requested

9 | the trial court to instruct the jury not to take any reference to polygraph tests into consideration,

10 | and the court complied.

11 |     "State and federal rulemakers have broad latitude under the Constitution to establish rules

12 | excluding evidence from criminal trials."  Holmes v. South Carolina, 547 U.S. 319, 324 (2006)

13 | (quotations and citations omitted).  This latitude is limited, however, by a defendant's

14 | constitutional rights to due process and to present a defense, rights originating in the Sixth and

15 | Fourteenth Amendments.  See id.  "While the Constitution prohibits the exclusion of defense

16 | evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that

17 | they are asserted to promote, well-established rules of evidence permit trial judges to exclude

18 | evidence if its probative value is outweighed by certain other factors such as unfair prejudice,

19 | confusion of the issues, or potential to mislead the jury."  Id. at 325-26.  The defendant, not the

20 | state, bears the burden of demonstrating that the principle violated by the evidentiary rule "is so

21 | rooted in the traditions and conscience of our people as to be ranked as fundamental."  Egelhoff,

22 | 518 U.S. at 47 (internal quotations and citations omitted).

23 |     The state appellate court rejected petitioner's claim on state evidentiary grounds and did

24 | not analyze it for any potential federal or constitutional violation.  (Resp. Ex. I, p. 30-31.)

25 | Nevertheless, this court concludes that the state court's decision rejecting petitioner's claim is

26 | not contrary to or an unreasonable application of clearly established federal law.  See United

27 | States v. Scheffer, 523 U.S. 303 (1998) (holding that a per se rule against the admission of

28 | polygraph evidence does not violate a defendant's right to present a defense under the Fifth or

1  Sixth Amendments).

2         12.    Accessory after the fact instruction

3         Petitioner alleges that the trial court violated his right to due process by disallowing a

4  jury instruction which would have instructed the jury on his theory of defense. (Petition at 14-1.)

5  Specifically, petitioner states that he requested a modified version[14] of CALJIC 6.40, the

6  instruction on accessories to a felony.

7         A state trial court's refusal to give an instruction must so infect the trial that the

8  defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. See

9  Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988). Failure to instruct on the theory of

10  defense violates due process if "the theory is legally sound and evidence in the case makes it

11  applicable." Clark v. Brown, 450 F.3d 898, 904-05 (9th Cir. 2006) (internal quotation omitted).

12  However, the defendant is not entitled to have jury instructions raised in his or her precise terms

13  where the given instructions adequately embody the defense theory. See United States v. Del

14  Muro, 87 F.3d 1078, 1081 (9th Cir. 1996).

15         Furthermore, the omission of an instruction is less likely to be prejudicial than a

16  misstatement of the law. See Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987). Thus, a

17  habeas petitioner whose claim involves a failure to give a particular instruction bears an

18  "'especially heavy burden.'" Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting

19  Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).

20  ─────────────────

21         [14] The proposed instruction read:

22         A person who, after a felony had been committed, harbors, conceals, or aids a principal in
           the felony with the specific intent that the principal may avoid or escape from arrest, trial,
23         conviction, or punishment, having knowledge that the principal has committed that
           felony or has been charged with that felony or convicted thereof, is guilty of the crime of
24         accessory to a felony in violation of Penal Code section 32. However, that person [is] not
           guilty of murder in any degree, nor is that person guilty of either voluntary or involuntary
25         manslaughter.

26
           You have not been given a verdict form for Accessory After the Fact and you are not to
27         deliberate about or speculate as to why or why not you have not been given a verdict
           form on this issue.
28

(Resp. Ex. A, p. 884.)
Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.Rmw\HC.06\Hall808den.wpd          35

1    The state appellate court rejected petitioner's claim.  It stated that the trial court permitted
2  counsel to argue that petitioner was only guilty of assisting after-the-fact, but could not argue the
3  theory as "accessory after the fact" because that particular phrase was neither charged nor
4  defined.  (Resp. Ex. I, p. 32.)  Subsequently, counsel did just that and argued that petitioner was
5  not guilty of murder or robbery unless the jury found that he participated in the murder or
6  robbery prior to the acts.  (Id.)

7    A review of the record demonstrates that the state court's determination was reasonable.
8  Defense counsel was able to argue the theory of defense, i.e., that petitioner was only involved in
9  covering up the crimes but did not participate in the crimes themselves, and thus, petitioner
10  could not be found guilty of murder or robbery.  Because being an "accessory after the fact" was
11  not a lesser included offense of any of the charged crimes, nor was it a legal defense to any
12  charged crime, and because petitioner was able to thoroughly argue that he was merely an
13  "accessory after the fact" in closing argument without using that specific legal phrasing,
14  petitioner is not entitled to habeas relief on this claim.  Cf. Hopkins v. Reeves, 524 U.S. 88
15  (1998) (holding that the Constitution does not require the jury to be instructed on offenses that
16  are not lesser-included offenses of the charged crimes); Solis v. Garcia, 219 F.3d 922, 929 (9th
17  Cir. 2000) (failure to instruct on lesser-included offenses is not a constitutional error).

18    Accordingly, the court concludes that the state appellate court's decision regarding an
19  alleged omission of a jury instruction was not contrary to, or an unreasonable application of
20  clearly established federal law, nor was it an unreasonable determination of the facts in light of
21  the evidence presented.  28 U.S.C. § 2254(d)(1), (2).

22    13.    Victim impact evidence

23    Petitioner claims that the testimony of the victim's ex-wife to identify a photograph of
24  the victim and testify about their relationship and other irrelevant matters.  (Petition at 15-1.)
25  Petitioner further alleges that this "victim impact" testimony violated his due process rights
26  because it was designed to elicit the sympathy of the jury.  (Petition at 15-1.)

27    The admission of evidence is not subject to federal habeas review unless a specific
28  constitutional guarantee is violated or the error is of such magnitude that the result is a denial of

1  the fundamentally fair trial guaranteed by due process.  See Henry v. Kernan, 197 F.3d 1021,

2  1031 (9th Cir. 1999).  In order to obtain habeas relief on the basis of an evidentiary error, a

3  petitioner must show that the error was one of constitutional dimension and that it was not

4  harmless under Brecht v. Abrahamson, 507 U.S. 619 (1993).  He would have to show that the

5  error had "a substantial and injurious effect on the verdict."  Brecht, 507 U.S. at 623.

6      The state appellate court rejected petitioner's claim both because he failed to make a

7  contemporaneous objection and, therefore, waived the issue on appeal, and also because any

8  error was harmless.  (Resp. Ex. I, p. 36-37.)  Specifically, the appellate court stated that it was

9  undisputed that the victim was killed, so any sympathy garnered by the witness was not likely to

10  prejudice the defendant, and the main issue at hand was whether defendant or Ryan killed the

11  victim.  (Id. at 37.)  Therefore, the court stated, the testimony of the ex-wife was unlikely to have

12  affected the verdict.  (Id.)

13      Here, as explained above, because California's contemporaneous objection rule is an

14  independent and adequate procedural bar, and petitioner gives no reason for cause or prejudice,

15  the court concludes that this issue is procedurally defaulted.  See Coleman, 501 U.S. at 750.

16  Alternatively, any error in admitting the testimony was harmless in light of the fact that the

17  victim's ex-wife's testimony was extremely brief, gave basic information about the victim, e.g.,

18  how long they had been friends, where the victim planned to vacation, what the victim did for a

19  living, and whether he was being treated for any medical issues (RT 1177-78), it is implausible

20  that such testimony would elicit sympathy from the jury such as to substantially affect the

21  verdict.  See Brecht, 507 U.S. at 623.

22      Accordingly, the court concludes that the state appellate court's decision regarding the

23  admission of victim impact testimony was not contrary to, or an unreasonable application of

24  clearly established federal law, nor was it an unreasonable determination of the facts in light of

25  the evidence presented.  28 U.S.C. § 2254(d)(1), (2).

26      14.    Cumulative error

27      Petitioner claims, in general, that he was deprived of a fair trial, in light of the cumulative

28  effect of all the claims raised.  (Petition at 16-1.)  However, where, as here, there is no single

1  constitutional error existing, nothing can accumulate to the level of a constitutional violation.

2  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

3        Accordingly, the court concludes that the state appellate court's decision regarding the

4  cumulative of any error was not contrary to, or an unreasonable application of clearly established

5  federal law, nor was it an unreasonable determination of the facts in light of the evidence

6  presented.  28 U.S.C. § 2254(d)(1), (2).

7                              **CONCLUSION**

8        For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk

9  shall enter judgment for Respondent and close the file.

10       IT IS SO ORDERED.

11  Dated:    12/22/08

12                                   RONALD M. WHYTE
                                     United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28